972 So.2d 619 (2006)
UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, Appellant,
v.
David PEACOCK, Individually and As Next Friend of Robert Earl Peacock, Appellee.
No. 2005-CA-00209-COA.
Court of Appeals of Mississippi.
November 7, 2006.
Rehearing Denied October 9, 2007.
*621 James A. Becker, Anastasia G. Jones, Jackson, attorneys for appellant.
Lara E. Gill, Ronald Keith Foreman, attorneys for appellee.
Before KING, C.J., GRIFFIS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. The University of Mississippi Medical Center ("UMC") appeals the judgment of the Circuit Court of Hinds County finding it liable under the Mississippi Tort Claims Act for the death of Robert Peacock and awarding his son the statutory maximum judgment at that time of $250,000.[1] On appeal, UMC argues that the trial court erred by accepting the expert designation and testimony of Dr. *622 Leon Sykes, Jr., and that the trial court made significant errors in its findings of fact. We find that while the trial court properly accepted the expert testimony of Dr. Sykes, the court made several erroneous findings of fact in support of its determination as to liability. Accordingly, we reverse and remand for further proceedings in the circuit court.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. At 6:50 a.m. on June 26, 1999, Robert Earl Peacock, while intoxicated, rear-ended a utility van. He was rushed to Magee General Hospital where the staff determined that he needed to be transported to UMC for medical treatment. Peacock was transferred to the Surgical Intensive Care Unit (SICU) at UMC, where he was conscious and able to communicate. He became increasingly agitated, however, and the treating physicians attributed his agitation to alcohol withdrawal. The doctors became concerned for Peacock's safety, and he was eventually strapped down and sedated. The following day, he was intubated and placed on intravenous fluids due to decreased pulmonary function.
¶ 3. When Peacock was admitted to the SICU, he was placed under the primary care of Dr. Karen Borman. Dr. Borman's initial examination revealed that Peacock had a scalp laceration, a blunt injury to the abdomen and chest, a hepatic hematoma, free blood in his abdomen, and a grade four liver laceration. From Peacock's initial admittance into UMC, it was noted that he had a distended abdomen. Peacock also had psoriasis, and throughout his treatment at UMC, the sores on his skin wept serous fluid. The grade four liver laceration was the injury of greatest concern, and Dr. Borman testified that she elected to treat this injury by non-operative management. Dr. Borman explained that this method of treatment allows inter-abdominal pressures to build until the pressure has a "tamponade" effect on the laceration, causing the bleeding to stop and allowing the wound to heal. The Appellee concedes that Dr. Borman's initial course of treatment did not breach the standard of care.
¶ 4. Peacock's condition remained relatively stable, but on July 2 it was noted that his abdomen had become increasingly distended. Dr. Newt Harrison, a resident who was involved in the treatment of Peacock, observed a steady decline in Peacock's condition throughout the first week of July. Late in the day on July 4, Peacock began experiencing peak inspiratory pressures[2] measured in the high 40's, and high bladder pressures in the mid-30's. In addition, his urine output dropped precipitously. Dr. Borman ordered an abdominal CT scan on July 3, which indicated that there was excess fluid in Peacock's abdomen but did not reveal an abscess or internal infection. Dr. Borman's notes from the evening of July 4 indicate that she considered the possibility that Peacock was suffering from abdominal compartment syndrome. Dr. Borman testified, however, that she believed that Peacock's worsening condition was caused by "SIRS (systematic inflammatory response syndrome) or sepsis."[3] Dr. Borman stated that she reached this conclusion because a test for staphylococcus infection had returned positive. Dr. Borman believed that the staph bacteria had likely entered Peacock's *623 bloodstream through the sores caused by his psoriasis, and that the resulting infection had led to sepsis.
¶ 5. On July 5, Peacock's condition was critical. There was evidence of multi-system organ failure. Dr. Borman and Dr. Harrison discussed with the Peacock family treatment options which would include multiple operations and prolonged periods on life support systems. Dr. Harrison testified by way of deposition that it "eventually came to the point where we had talked to the patient about dialysis as  a probable need for dialysis, as well as we felt to be  he was going to possibly need an exploratory laparotomy for what we felt was Abdominal Compartment Syndrome and he was going to require long-term ventilatory support, multiple operations." The physicians, honestly discussing the risks and benefits of these procedures, advised the family that Peacock's chance of survival, even with the procedures, was low. Peacock's son, David, declined the additional measures and signed a non-resuscitation order. When Peacock was removed from the ventilator on July 8, he expired. The official cause of death was listed as multiple-system organ failure secondary to sepsis.
¶ 6. David Peacock filed suit for the death of his father under Mississippi's wrongful death statute on September 26, 2000. Dr. Borman was an employee of UMC, a state entity, during the treatment of Peacock, and the case was therefore brought under the Mississippi Tort Claims Act. After a motion for summary judgment and a motion to strike the affidavit of Peacock's expert were denied, a bench trial was conducted on May 18 and 19, 2004.
¶ 7. Peacock's case at trial was built around the expert testimony of Dr. Leon N. Sykes, Jr., a board-certified surgeon in general, thoracic, and critical care surgery. Dr. Sykes practiced and also taught medical students at Mt. Sinai Medical Center in Chicago, Illinois. Dr. Sykes was of the opinion that, prior to July 2, 1999, Peacock was exhibiting signs of abdominal compartment syndrome. He supported this conclusion by noting that the doctor's notes from Peacock's initial admittance reflected that Peacock had a distended abdomen. By July 2, according to Dr. Sykes, the standard of care required that a laparotomy be immediately performed on Peacock to reduce intra-abdominal pressures. Dr. Sykes testified that because a laparotomy was not performed, the pressures in Peacock's abdomen continued to build to the point that other vital processes were impaired. Dr. Sykes stated that left untreated, abdominal compartment syndrome results in death. He dismissed Dr. Borman's reluctance to perform a laparotomy because of the positive staph bacterium sample, stating that the danger of a staph infection was too remote. According to Dr. Sykes, on July 2, the treating physicians should have either (1) measured Peacock's bladder pressure to confirm or deny the existence of abdominal compartment syndrome or (2) proceeded immediately to the operating room to perform a laparotomy and relieve the abdominal pressures.
¶ 8. The trial court agreed with the plaintiff's theory of the case, and issued a memorandum opinion and order on November 17, 2004, which essentially adopted the plaintiff's proposed findings of fact in toto. The court found that Peacock had experienced pain and suffering prior to his death, and therefore awarded the statutory maximum amount of damages at that time of $250,000 under the Mississippi Tort Claims Act. On appeal, UMC attacks Dr. Sykes's testimony as unreliable, and further contests the trial judge's findings of fact. While we find that Dr. Sykes was qualified to testify as an expert witness, and that UMC's complaints regarding his *624 testimony should have been brought during voir dire or cross-examination, we find that certain of the trial judge's findings of fact are clearly erroneous. As we cannot determine whether these erroneous findings were essential to the trial court's ultimate finding of negligence, we remand for further consideration and findings by the trial court.
I. Whether the testimony of Dr. Sykes satisfies the Daubert test for reliability.
¶ 9. Admission of expert testimony is governed by Rule 702 of the Mississippi Rule of Evidence, which holds that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Provided that the expert is qualified, he may testify in his area of expertise "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Id.
¶ 10. The Mississippi Supreme Court has recognized that the admission of expert testimony under Rule 702 is governed by a modified Daubert standard. Mississippi Transp. Comm'n v. McLemore, 863 So.2d 31 (Miss.2003).
[T]he analytical framework provided by the modified Daubert standard requires the trial court to perform a two-pronged inquiry in determining whether expert testimony is admissible under Rule 702. . . . First, the court must determine that the expert testimony is relevant. . . . Next, the trial court must determine whether the proffered testimony is reliable. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability. . . .
Id. at 38(¶ 16) (citations omitted). The factors listed in Daubert include:
whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
McLemore, 863 So.2d at 37(¶ 13).
¶ 11. The Comment to Rule 702 clearly notes it is "the gate keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable." M.R.E. 702 cmt. "[T]here is universal agreement that the Daubert test has effectively tightened, not loosened, the allowance of expert testimony." McLemore, 863 So.2d at 38(¶ 17). The reliability inquiry is, however, "a flexible one," with the trial court having "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. at 37(¶ 13) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), respectively).
¶ 12. At trial, UMC contested neither Dr. Sykes's qualifications as an expert nor the relevancy or reliability of his testimony. On appeal, UMC admits that Dr. Sykes was qualified to testify in his proffered field of expertise, "surgery and surgery critical care," but questions the reliability of Dr. Sykes's testimony. UMC claims that Dr. Sykes's testimony was not supported by the record, scientific analysis or personal studies and should not have been relied upon by the trial court as a basis for its findings of fact. Peacock *625 counters that UMC's failure to object to Dr. Sykes's testimony at trial bars it from raising the issue for the first time on appeal. UMC replies that it is asserting a Daubert challenge not to the qualifications of the witness but to the reliability and credibility of his opinion testimony. UMC claims that the trial court should have determined that Dr. Sykes's testimony was not reliable for the reasons stated in its appellate brief, should not have relied upon that testimony as a basis for its findings of fact, and should have granted UMC's motions for directed verdict or post-trial motions.
¶ 13. The problem with UMC's argument is that it never made any Daubert challenge below. There is nothing in the record to reflect that the detailed matters raised in UMC's appellate brief concerning the reliability of Dr. Sykes's testimony were ever called to the trial court's attention. UMC did "not challenge his qualifications to testify." The only objection UMC made on motions to reconsider and to set aside the verdict to the trial court's reliance on the testimony of Dr. Sykes, was that Dr. Sykes testified to matters beyond the information disclosed in discovery.[4] UMC made no challenge to Dr. Sykes's testimony as being unreliable and made no motion to strike. UMC argues that its Daubert challenge is preserved on appeal because it filed post-trial motions asking that the court's judgment be set aside "because the findings of fact made by the trial court were not supported by the evidence and were an abuse of discretion." While this argument certainly preserved UMC's right to contest the accuracy of the trial court findings, we do not find that it was sufficiently precise as to raise a Daubert challenge to the reliability of Dr. Sykes's opinion. The proper forum for attacks on the reliability of Dr. Sykes's testimony was in the trial court.
¶ 14. Where a party fails to object to the admission of expert testimony during trial, the appellate court reviews the decision to admit that evidence for plain error. U.S. v. Mornan, 413 F.3d 372, 379 (3rd Cir.2005); Rushing v. Kansas City S. Ry., 185 F.3d 496, 506 (5th Cir.1999) ("[f]ailure to object to expert testimony forfeits the objection, precluding full review on appeal"). "Deference to the trial judge['s determination of reliability of expert testimony] is particularly warranted where the defendant does not object to the admissibility of the expert's testimony." Mornan, 413 F.3d at 380. In Mississippi, a finding of plain error is necessary where a party's substantive/fundamental rights are affected and the error results in a "manifest miscarriage of justice." Williams v. State, 794 So.2d 181, 187(¶ 23) (Miss.2001). To determine whether plain error has occurred, the appellate court "must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial." Cox v. State, 793 So.2d 591, 597(¶ 22) (Miss.2001).
¶ 15. In our case, UMC does not address a plain error analysis in its brief, nor does it claim a violation of substantial or fundamental rights. We have determined through our own research, however, that the $250,000 judgment against UMC would in fact affect a "substantial right" of the State because of the involvement of state funds. See State Highway Comm'n. v. Hyman, 592 So.2d 952, 957 (Miss.1991) (determining a substantial right of State is involved when over $60,000 of State's money is at issue in appeal of eminent domain case, thereby justifying plain error analysis). *626 Thus, even though UMC failed to object to the admission of Dr. Sykes's expert testimony at trial, this Court may review the trial court's decision to admit that evidence for plain error. With these precepts in mind, however, we cannot find that the trial court's admission of Dr. Sykes's testimony constituted "plain, clear or obvious" error.
¶ 16. At the time of trial, Dr. Sykes was a practicing surgeon and surgical intensivist at Mt. Sinai Medical Center, Chicago, Illinois, a 450-bed hospital with a level one trauma center. He explained that, as a surgical intensivist, he had received additional training which qualified him "to care for patients in an intensive care unit." Dr. Sykes was a staff surgeon at Mt. Sinai, who had privileges to practice in general surgery, general thoracic surgery, trauma surgery, and surgical critical care. He was board certified in general surgery, thoracic surgery, and surgical critical care. Dr. Sykes testified that he had actively managed several grade four liver lacerations within the previous year.
¶ 17. Specifically, UMC contests the reliability of three points made by Dr. Sykes:
(1) That Peacock had abdominal compartment syndrome because he had increased inspiratory pressure, oliguria,[5] and abdominal distension, along with very high bladder pressures. Dr. Sykes opined that the standard of care required a laparotomy to reduce these elevated abdominal pressures, otherwise Peacock would die.
(2) That Peacock had "classical presentation" for abdominal compartment syndrome on July 2 because he had a "very distended, very firm abdomen," peak inspiratory pressures were "above 40 and into the mid-40s," and "diminished urine output."
(3) That when bladder "pressure reaches 20 or greater, that is abdominal compartment syndrome." Dr. Sykes also noted "certainly if the patient has that pressure . . . [and] the patient also has oliguria and . . . these very high peak inspiratory pressures, that is abdominal compartment syndrome."
¶ 18. UMC contends that these opinions are not reliable because "Dr. Sykes ignores the necessary element of cardiovascular dysfunction in his diagnosis of abdominal compartment syndrome;" no foundation of reliable data or methodology was established to support Dr. Sykes's opinion; and Dr. Sykes's opinion is not based on the facts. We cannot find error, much less clear error, in the trial court's acceptance of Dr. Sykes's testimony in this case.
¶ 19. First, Dr. Claude Minor, a defense expert, testified that cardiovascular dysfunction was a necessary element for a diagnosis of abdominal compartment syndrome.[6] UMC notes that Dr. Minor's testimony was supported by a recent study sponsored by the Vanderbilt School of Medicine, whereas Dr. Sykes did not cite to a scientific journal in making his diagnosis. UMC also claims that while Dr. Sykes twice admitted that cardiovascular dysfunction is necessary for a finding of abdominal compartment syndrome, he ignored the element in his opinion, thereby rendering it unreliable.
¶ 20. We cannot agree with UMC's assertions. Dr. Sykes was not questioned regarding UMC's contention that a finding of cardiovascular dysfunction was necessary for a diagnosis of abdominal compartment syndrome. Furthermore, counsel for *627 UMC failed to cross-examine Dr. Sykes with the Vanderbilt study which it claims nullifies his testimony. In fact, the expert testimony of Dr. Minor, which UMC now deems critical, was not even brought out on his direct examination, but as more of an afterthought on cross examination.[7] UMC points to certain of Dr. Sykes's testimony which UMC claims is an admission that a finding of cardiac dysfunction is necessary for a diagnosis of abdominal compartment syndrome. The cited testimony is Dr. Sykes's statement that "increased intra-abdominal pressures can interfere with function of the heart. . . ." (Emphasis added). Clearly this is not the admission claimed by UMC. Dr. Sykes nowhere indicated that decreased cardiac function was necessary for a diagnosis of abdominal compartment syndrome. The second alleged admission is contained in the affidavit of Dr. Sykes (which was introduced for identification purposes only) wherein he mentioned that "increased intrathoracic pressure can . . . impair venous return to the heart" as part of the reason "[a]bdominal compartment syndrome is a significant problem. . . ." Dr. Sykes's explanation of the diagnosis of abdominal compartment syndrome is contained later in the paragraph and does not list cardiovascular dysfunction as one of the bases for diagnosis. We further note that neither Dr. Borman nor Dr. Harrison mentioned lack of cardiac impairment as a reason why they rejected abdominal compartment syndrome as a diagnosis for Peacock. Based on this record, we cannot find that Dr. Sykes's failure to consider lack of cardiac impairment renders his testimony unreliable.
¶ 21. Second, UMC contends that no foundation of reliable data or methodology was established to support Dr. Sykes's opinion as he "did not rely on or even cite any scientific journals or studies supporting the parameters he considered in making the diagnosis [and] never stated that he had any personal experience in treating patients with abdominal compartment syndrome." As previously noted, the Daubert reliability inquiry is "flexible," with the trial court having "`considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" McLemore, 863 So.2d at 37(¶ 13) (quoting Daubert, 509 U.S. at 594, 113 S.Ct. 2786; Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167, respectively). If citation to a medical journal or *628 express statement of personal experience in treating patients with abdominal compartment syndrome was a prerequisite to testifying, both Dr. Sykes's and Dr. Borman's opinions would have to be excluded. Upon Dr. Sykes testifying to his treatment of patients with grade four liver lacerations, UMC decided not to challenge his qualifications to testify, stating that it would "use the rest of [its] questions in cross." Neither party saw fit to question Dr. Sykes regarding his experience regarding treatment of patients with abdominal compartment syndrome. While UMC correctly notes that Dr. Sykes "never stated" he had any personal experience in treating patients with abdominal compartment syndrome, we cannot presume at this late date that he did not. If experience with abdominal compartment syndrome, as distinguished from experience with grade four liver lacerations, was so vital to Dr. Sykes's reliability, vel non, we find that it was incumbent on UMC to bring out that lack of experience on the record. We find no error on the trial court's part in failing to realize this distinction.
¶ 22. Third, UMC contends that Dr. Sykes's testimony is not reliable as it is contrary to certain of Peacock's medical records and to the testimony of other expert witnesses. Although UMC presents potentially relevant questions regarding certain of the medical records, we note that none of these questions were posed to Dr. Sykes during voir dire or cross-examination. We cannot find that the trial court erred in failing to conduct its own independent review of the medical records to determine whether any matters contained therein called Dr. Sykes's opinions into question.
¶ 23. We thus reject UMC's Daubert challenge to Dr. Sykes's testimony.
II. Whether the trial court erred in its findings of fact.
¶ 24. A circuit judge sitting as the finder of fact in a bench trial is subject to the same standard of review as a chancellor. DePriest v. Barber, 798 So.2d 456, 459(¶ 10) (Miss.2001) (quoting Sweet Home Water & Sewer Ass'n v. Lexington Estates Ltd., 613 So.2d 864, 872 (Miss.1993)). Deference is thus accorded to the findings of the trial court, and when the findings are supported by substantial evidence, the findings, along with all reasonable inferences which may be drawn therefrom, are affirmed. May v. Harrison County Dept. of Human Servs., 883 So.2d 74, 77 (Miss. 2004).
¶ 25. "The practical premise underlying our limited review of matters of fact is that the trial court heard the testimony and observed the demeanor of witnesses and from this made the tough and necessary credibility choices." Omnibank of Mantee v. United S. Bank, 607 So.2d 76, 83 (Miss.1992). But when a chancellor adopts a litigating party's proposed findings of fact verbatim, there is nothing to suggest that any of the findings except in broad outline are the product of the trial court's adjudicatory process. Id. In this case, we must "`engage in [a] much more careful analysis.'" Id. "We must keep a keen eye for gratuitous slants. Common sense suggests our duty of `deference to such findings is necessarily lessened.'" Id.
¶ 26. In its brief, UMC itemizes seven statements in the trial court's findings of fact which it claims are erroneous. David Peacock does not respond to UMC's itemized facts, rather, he cites to us a more lenient standard of review and addresses the findings in a more generalized manner. We will address UMC's contentions point by point, examining the findings of the court, and comparing those findings to any *629 testimony and/or evidence which would support them. We agree with UMC that each of these enumerated findings must be subjected to a more strict standard of review, as they were adopted verbatim from the plaintiff's proposed findings of fact.
A. Whether Peacock had abdominal compartment syndrome.
¶ 27. UMC contends that the trial court erred in concluding that Peacock suffered from abdominal compartment syndrome. In support of its argument, UMC cites the testimony of Dr. Minor that a finding of cardiac dysfunction was a necessary element in a diagnosis of abdominal compartment syndrome. Because cardiac dysfunction was not noted in any of the evidence introduced at trial, the defense contends that Peacock did not have abdominal compartment syndrome. Peacock counters that the court's findings were based upon substantial evidence because they were supported by the testimony of Dr. Sykes.
¶ 28. The language of the trial court order, adopted verbatim from Peacock's proposed findings of fact, states:
Dr. Leon Sykes, accepted by the Court as an expert witness in the field of surgery and surgery critical care, testified that Robert Peacock had `abdominal compartment syndrome' based upon the presence of increased peak inspiratory pressure, oliguria (lack of urine output) and abdominal distension, confirmed by very high bladder pressures. . . . Dr. Sykes further opined that Robert Peacock had `abdominal compartment syndrome' which resulted directly in respiratory failure, renal failure and multiple organ system failure. . . . Based upon the expert testimony herein, the Court agrees with the plaintiff's contention.
UMC does not contest that this was the opinion of Peacock's expert, Dr. Sykes, but argues that his opinion is faulty because of the countering opinion of Dr. Minor that cardiac dysfunction must be present for a diagnosis of abdominal compartment syndrome and Dr. Sykes's alleged agreement with that requirement. As previously discussed, we cannot accept UMC's interpretation of Dr. Sykes's testimony. Dr. Sykes nowhere admitted that decreased cardiac function was necessary for a diagnosis of abdominal compartment syndrome. We are not at liberty to reject Dr. Sykes's testimony merely because Dr. Minor disagrees with it. We find that there was sufficient evidence upon which the trial judge, as finder of fact, could have found that Peacock suffered from abdominal compartment syndrome.
¶ 29. We are concerned, however, with a related finding by the trial court that: "The defense contends that, although Robert Peacock suffered from abdominal compartment syndrome, it was managed appropriately." Again adopted verbatim from the plaintiff's proposal, this statement is unsupported by the record. Although UMC admits that a diagnosis of abdominal compartment syndrome was considered by both Dr. Borman and Dr. Harrison, it does not concede that Peacock suffered from abdominal compartment syndrome. At trial and on appeal, UMC takes the position that Peacock did not suffer from abdominal compartment syndrome because the treating physicians did not observe cardiac dysfunction.
¶ 30. This finding by the trial court seems particularly incredible because the trial court notes in another part of its opinion that the defense expert, Dr. Minor, clearly advanced the opinion that Peacock never suffered from abdominal compartment syndrome. Other parts of the trial court's order are inconsistent with this finding as well. We address these inconsistencies infra. We find, ultimately, that *630 Peacock proposed certain findings of fact which placed a "gratuitous slant" on the evidence introduced at trial, and, as demonstrated here, proposed other inconsistent findings which are not supported by the record. The trial court, without the benefit of the transcript which we are able to examine today, may well have been misled by these proposals, and in turn adopted several erroneous findings of fact.
B. Whether a laparotomy would have relieved abdominal pressure in Peacock's case.
¶ 31. The trial court, in its findings of fact, noted "[t]estimony further revealed that if abdominal compartment syndrome is not addressed, the patient will die, and the standard of care required a laparotomy to be undertaken to relieve the patient's intra-abdominal pressure." The testimony to which the court refers is the direct examination of Dr. Sykes, who stated that the standard of care required a laparotomy be performed to reduce intra-abdominal pressures. When asked at trial to explain what steps should be taken to reduce intra-abdominal pressure, he opined, "The first thing that is done to reduce intra-abdominal pressure is to actually open the abdomen. It's a laparotomy incision. . . . [O]nce the incision is made, if the abdominal pressure is elevated due to the fact that the patient has a lot of fluid in the abdomen, that fluid can immediately drain out."
¶ 32. UMC counters with the testimony of Dr. Borman, who stated that "[t]here was nothing that suggested that there was such compression in the abdomen that [a] laparotomy would have achieved material benefit." When questioned on direct as to whether she agreed with Dr. Sykes's testimony that the standard of care required a laparotomy be performed to reduce intra-abdominal pressures, Dr. Borman responded that, "I did not perceive that there was likely benefit to laparotomy." Dr. Borman was of the opinion that, because Peacock's condition was caused by SIRS, a laparotomy would not have been successful in lowering intra-abdominal pressures. Dr. Borman did admit, however, that, "[y]ou can lower intra-abdominal pressure when it's elevated by opening the abdomen, yes."
¶ 33. Accepting the testimony of Dr. Sykes, together with all reasonable inferences which may be drawn therefrom in favor of the trial court's finding, Dr. Sykes's evidence may have been sufficient to support the finding that a laparotomy would have relieved Peacock's abdominal pressure.[8] The trial court, in making the finding that a laparotomy could have relieved abdominal pressure, apparently relied on the alleged admission by Dr. Borman that she could have performed a laparotomy on July 2, 1999, that would have relieved pressure. However, the latter admission is reviewed and rejected by this Court infra. Our rejection of this latter admission compromises the finding of fact that a laparotomy would have relieved the pressure. While the dissent suggests that "this Court cannot say the lower court necessarily relied upon any of Dr. Borman's testimony in order to make this finding," the plaintiff *631 identifies Dr. Borman's alleged admission as "important." As we determine this admission to be erroneous, we remand this finding for reconsideration by the trial court.
C. Whether Dr. Borman admitted that she could have performed a laparotomy on July 2, 1999.
¶ 34. The trial court's findings of fact note:
Defendant's position is that due to Mr. Peacock's condition of multiple organ failure and sepsis that it was not possible to perform a laparotomy on Mr. Peacock and that the risks of a laparotomy outweighed the benefits. Dr. Borman admitted, however, that on July 2, 1999, it was possible to perform a laparotomy on Robert Peacock that would have lowered his intra-abdominal pressure at a time when there was no multi-system organ failure or sepsis.

(Emphasis added). UMC argues that these findings unfairly characterize Dr. Borman's testimony as an admission of fault. We agree. The trial court order suggests that Dr. Borman would not perform a laparotomy on Peacock due to the presence of sepsis, but then that she contradicted herself by stating that she could have performed the operation before the sepsis was present. Dr. Borman's actual testimony was elicited on cross-examination:
Q. There was a point, was there not, when you could have performed a laparotomy on Mr. Peacock before he developed multi-system organ failure and sepsis?
A. In theory, sir, I could have performed a laparotomy every day preceding his death so, I'm sorry, I'm a little pressed to answer your question.
Q. Well, you point to these problems, the multi-system organ failure and sepsis that were occurring about the time that Mr. David Peacock signed the do not resuscitate order. And my question is there was a time when Mr. Robert Peacock did not have sepsis and did not have multisystem organ failure when you could have performed a laparotomy and those complications did not exist?
A. Mr. Papillion, with all respect, I could operate on you today. That doesn't mean you need an operation. I could have operated on Mr. Peacock every day of his hospitalization. However, if there is no clear benefit to be gained then that would be more wrong or as wrong as not operating on him if he clearly needed one. I'm sorry, I really can't agree with the way you phrased that.
Q. One of the benefits of a laparotomy is that it would lower intra-abdominal pressure if that factor, increased intra-abdominal pressure, was contributing to organ failure, correct?
A. You can lower intra-abdominal pressure when it's elevated by opening the abdomen, yes.
Q. And before July 3rd, for example, certainly July 2nd; it was possible, was it not, to perform a laparotomy on Mr. Robert Peacock that would have lowered his intra-abdominal pressure at that time when there was not a concomitant multi-system organ failure and sepsis, correct?
A. Actually I believe the blood culture was reported to us about 36 hours after that so that the odds were that that bacteria was growing at that time. So I think we can't exactly date the beginning of sepsis. We *632 can date some clear change in his condition around the 2nd. I think the next thing would be, again, when we do an operation we do it for a purpose that has value to the patient. We don't operate to change a number. We operate to do something that has value to a patient. At the point in time that we can operate to change a number if there's not clear value to a patient and there are downsides to doing it, then there is a choice to be made about whether that should be done.
¶ 35. Nowhere in this colloquy do we find an admission of fault by Dr. Borman. Neither do we find a contradiction in Dr. Borman's testimony. She clearly states that, although a laparotomy could be performed on anyone at anytime, she did not believe this was the correct procedure to perform on Peacock during this time period. She also states that on July 2, there was a change in Peacock's condition, and that sepsis was likely present, and that a laparotomy would have not have been beneficial.
¶ 36. The plaintiff's proposed finding placed an improper slant on Dr. Borman's testimony. Fairness to the parties involved in this action mandates that we reject this finding as an unfair mis-characterization of Dr. Borman's testimony.
D. Whether Dr. Borman believed that Peacock had abdominal compartment syndrome.
¶ 37. The trial court order states: "Dr. Borman did, however, feel that Robert Peacock had abdominal compartment syndrome." We are unable to find substantial support for this statement in the record before us. Dr. Borman's testimony which would most closely address this finding was elicited on cross-examination:
Q. You agree with Dr. Sykes that Mr. Peacock developed abdominal compartment syndrome?
A. I agree that prior to his death he had abdominal compartment syndrome pressures  levels that are consistent with abdominal compartment syndrome. I think that Dr. Sykes has attributed many things of Mr. Peacock solely to that one condition. I disagree with him that that was the major condition that produced those organ failures.

There were other explanations for those that I find credible and those are the ones on which we based Mr. Peacock's treatment. So I guess my answer to you is I agree that the pressure of 37 that was documented later is an abnormal pressure.

(Emphasis added). On redirect examination, Dr. Borman again acknowledged that when the pressure reached 37, "and going forward, certainly some organ change could be in part due to the pressure. The underlying process and the majority of this process was sepsis and SIRS." (Emphasis added). Clearly Dr. Borman stated that the intra-abdominal pressures recorded were similar to the levels that exist when abdominal compartment syndrome is present. However, she stated that those elevated pressures could come from other causes, and that it was her belief that these other causes, and not abdominal compartment syndrome, led to the elevated pressures.
¶ 38. Again, we note that this finding was proposed by the plaintiff and adopted verbatim by the court. After viewing Dr. Borman's testimony, we find that at most she acknowledged that some of the change could have been from abdominal compartment syndrome after the pressure reached 37; however, she emphasized that "the underlying process and the majority of the *633 process was sepsis and SIRS." The proposed finding that Dr. Borman "believed that Peacock had abdominal compartment syndrome" mischaracterized Dr. Borman's testimony and was therefore clearly erroneous.
E. Whether Peacock had no urine output on July 4.
¶ 39. The trial court order stated that Peacock's "intra-abdominal pressure was first measured to be 20-22 on July 3, 1999. His intra-abdominal pressure increased to 37-38 on July 4, 1999. At that time, Robert Peacock's renal function was failing. He had no urine output and his creatinine and potassium levels were elevated to dangerously high levels." (Emphasis added). UMC takes to task the statement that Peacock had no urine output on July 4.
¶ 40. From an examination of the doctors' notes on July 4, we find evidence of decreasing urine output. The urine output is indicated as "marginal," and at the end of the day is noted to have dropped even further. The notes also indicate, in emphasized writing, that Peacock's prognosis at that time was "poor." However, even on the morning of July 5, Peacock is noted as having a urine output of "10 cc/hr." Thus, it is simply incorrect that Peacock had "no" urine output on July 4.
¶ 41. This being the case, the trial court's finding is clearly erroneous. While we note that the significant decrease in urine output may have supported the court's ultimate conclusion, we cannot allow a clear misstatement of fact to go unchecked.
F. Whether UMC diagnosed Peacock with abdominal compartment syndrome on July 4.
¶ 42. The trial court order states, "On July 4, 1999, the University Medical Center diagnosed Robert Peacock's problem as `abdominal compartment syndrome.'" We are unable to find support for this finding in the record. The testimony and evidence introduced at trial establishes that, while a diagnosis of abdominal compartment syndrome was considered, among others, Peacock was never diagnosed by UMC as having abdominal compartment syndrome.
¶ 43. Dr. Harrison stated, in his deposition:
On the  around the first week of July, the patient's clinical condition started deteriorating and things were done to try to curtail that, and it was  eventually came to the point where we had talked to the patient about dialysis as  a probable need for dialysis, as well as we felt to be  he was going to possibly need an exploratory laparotomy for what we felt was Abdominal Compartment Syndrome and he was going to require longterm ventilatory support, multiple operations.
This statement is vague at best. We note that it is possible for the trial court to take the statement "what we felt was Abdominal Compartment Syndrome" to be a diagnosis of abdominal compartment syndrome. However, the fact that Dr. Harrison stated that Peacock was "going to possibly need an exploratory laparotomy" contradicts the idea that the doctors had agreed upon a diagnosis. The fact that the laparotomy was qualified as exploratory indicates that the doctors were not yet sure of the cause of Peacock's condition, although they considered or "felt" that the cause may have been abdominal compartment syndrome. If the doctors were already sure of the diagnosis, there certainly would have been no need for an exploratory surgery.
¶ 44. Even if we give the trial court finding every benefit of the doubt and *634 assume that a diagnosis of abdominal compartment syndrome was made, there is nothing in Dr. Harrison's statement which would set the day of the diagnosis as July 4. In fact, Peacock implicitly admits this mistake in his appellate brief, stating that the diagnosis of abdominal compartment syndrome was made "on or about July 4." Of course, the order of the trial court does not contain this "or about" language.
¶ 45. The doctors' notes from July 4 show consideration of abdominal compartment syndrome. The first page of notes from July 4 show the results of a CT scan on July 3, which reflected "no impingement of organs or compartment syndrome." The CT scan also showed large amounts of blood in the abdomen, but that "intra-abdominal pressure was not impressive for compartment syndrome." Later in the notes, Dr. Borman wrote "Renal dysfunction could be hypovolemia (2ry to 3rd spacing) or compartment syndrome or combination thereof." (Emphasis added). The Expiration Summary prepared by UMC stated that Peacock's "abdominal tension continued to increase to the point where we at the Trauma Service were worried about an abdominal compartment syndrome." (Emphasis added).
¶ 46. Clearly UMC did not diagnose abdominal compartment syndrome on July 4. The evidence is clear that the treating physicians considered a diagnosis of compartment syndrome, but did not at any point document a conclusion that this was the condition from which Peacock suffered. In this regard, the doctors' notes are consistent with the testimony of Dr. Borman and Dr. Harrison. We further note that Dr. Sykes, the plaintiff's expert, stated in his affidavit that "The breach [of the standard of care] is particularly egregious, because the progress notes reveal that in spite of the fact that the diagnosis was entertained, the decision was made to do nothing about it." (Emphasis added). The plaintiff reinforces this testimony by noting in his brief "Dr. Sykes testified that UMC breached the standard of care in failing to recognize Mr. Peacock's symptoms of abdominal compartment syndrome. . . ." (Emphasis added).
¶ 47. There are two major problems with the trial court's erroneous finding that UMC actually diagnosed abdominal compartment syndrome on July 4. First, the court may well have relied on the alleged diagnosis as a basis for its finding that Peacock actually suffered from abdominal compartment syndrome. Second, we are unable to discern whether UMC is being held liable for diagnosing abdominal compartment syndrome and then failing to follow the proper procedures to treat it, or whether UMC is actually being held liable for failing to diagnose abdominal compartment syndrome in the first place. The confusion extends even to the plaintiff, who states in one part of his appellate brief that: "Although UMC considered a diagnosis of abdominal compartment syndrome, the staff did nothing about it. If a patient has abdominal compartment syndrome and it is not treated, the patient will die. UMC's failure to identify and treat Robert Peacock's abdominal compartment syndrome proximately caused his death."[9] (Emphasis added). Then, later in his brief, the plaintiff reverses this position and states: "On or about July 4, 1999, Dr. Harrison informed Peacock that his father would need an exploratory laparotomy for what he believed was abdominal compartment syndrome. Dr. Borman confirmed this diagnosis in her testimony at trial. *635 . . ." (Emphasis added). In another section of his brief, the plaintiffs states: "Moreover, both Dr. Borman and Dr. Harrison agreed with Dr. Sykes' opinion regarding Mr. Peacock's abdominal compartment syndrome."[10] Finally, the plaintiff states, "Dr. Minor was therefore the only expert witness disputing the presence of abdominal compartment syndrome."
¶ 48. UMC cannot be held liable for both diagnosing Peacock with abdominal compartment syndrome and not diagnosing Peacock with abdominal compartment syndrome. This finding made by the trial court, and yet again adopted verbatim from the plaintiff's proposed findings, is contradictory and must be returned for reevaluation.
¶ 49. The plaintiff also attempts to support the idea that a diagnosis was made by pointing to the cross-examination of the defense expert, Dr. Minor:
Q. I didn't understand exactly whether it was your testimony that Mr. Peacock had abdominal compartment syndrome or not.
A. Hopefully I was clear on that. He did not.
Q. It's your testimony that he did not.
A. Yes, sir.
Q. You disagree with Dr. Sykes that Mr. Peacock developed abdominal compartment syndrome?
A. Absolutely.
Q. You disagree with Dr. Borman that Mr. Peacock developed abdominal compartment syndrome?
A. Yes, sir.
(Emphasis added). The fact that plaintiff's counsel mischaracterized Dr. Borman's testimony as indicating a diagnosis of abdominal compartment syndrome and then elicited a disagreement with that non-existent testimony certainly does nothing to change Dr. Borman's actual testimony: that she considered a diagnosis of abdominal compartment syndrome, but ruled it out as the cause of Peacock's declining health.[11] Furthermore, this argument does nothing to resolve the dichotomy found in the plaintiff's brief as to whether UMC did or did not diagnose abdominal compartment syndrome.
G. Whether Dr. Harrison believed that Peacock suffered from abdominal compartment syndrome.
¶ 50. UMC argues that the trial court order mischaracterizes the testimony of Dr. Harrison by noting that he believed Peacock suffered from abdominal compartment syndrome. The finding in question is "Dr. Claude Minor, defendant's expert, not only disagreed with Dr. Sykes, he also disagreed with Drs. Borman and Harrison. Dr. Minor opined that Robert Peacock did not have abdominal compartment syndrome."
*636 ¶ 51. We have discussed Dr. Harrison's allegedly incriminating statement previously, in which he noted that the doctors "felt" that Peacock had abdominal compartment syndrome and would possibly need an exploratory laparotomy. As with Dr. Borman's testimony, we are unable to find that this language was a diagnosis of abdominal compartment syndrome.
¶ 52. It is true, however, that Dr. Minor stated on cross-examination that he disagreed with the opinions of Dr. Borman and Dr. Harrison. But as discussed previously, we find that the testimony of Dr. Harrison and Dr. Borman was mischaracterized to elicit this response from Dr. Minor.
¶ 53. To conclude, we find that the trial court erred in adopting certain findings of fact identified above in that they are not supported by substantial evidence. As we cannot determine whether these erroneous findings were essential to the trial court's ultimate finding of negligence, we reverse and remand for further consideration and findings by the trial court.
III. Whether the trial court disregarded other risk factors.
¶ 54. UMC also argues that the trial court order is not supported by substantial evidence because it disregards (1) "the status of Robert Peacock's health prior to the accident as risk factors for surgery," and (2) "the risk factors of the surgery itself." In particular, UMC notes the facts that Peacock was a fifty-eight year old alcoholic, a heavy smoker, had psoriasis, and took multiple medications for psychiatric conditions. UMC contends that the trial court erred in failing to consider the testimony that these risk factors contributed to Peacock's condition and decreased the chances of a successful surgery. UMC also points to the risks of the surgery itself, such as the potential to dislodge a blood clot, causing Peacock to bleed to death, or the chance that infection could set in following the surgery. While the Appellee did not respond to these arguments specifically, we note that these subjects were partially and indirectly addressed by Dr. Sykes's in his testimony. As these matters are fact intensive and the case otherwise requires remand, we suggest that the trial court address these issues on remand.
¶ 55. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, J.
CHANDLER, J., Dissenting:
¶ 56. With respect, I dissent from the majority's decision to reverse and remand this case for further consideration and findings by the trial court. I believe that the trial court's findings were substantially supported by credible evidence in the record and were not clearly erroneous. Therefore, I would affirm. I also briefly address the majority's analysis of the expert testimony issue raised by UMC.
A. Expert testimony
¶ 57. This was an ordinary medical malpractice case in which both parties offered the testimony of medical experts pursuant to Mississippi Rule of Evidence 702. In a classic "battle of the experts," the physicians gave conflicting medical testimony and the trial court, acting as the fact-finder, determined which testimony to rely upon. UMC challenges, for the first time *637 on appeal, the admissibility under Rule 702 of the opinion testimony rendered by Peacock's expert, Dr. Leon Sykes.
¶ 58. Certainly, having squandered its opportunity to raise this issue at the trial level, UMC is procedurally barred from raising this issue on appeal. M.R.E. 103(a). The majority so finds, but then engages in an exhaustive analysis of the issue pursuant to the plain error doctrine, finally concluding that no plain error occurred. I disagree with the majority's approach to the concept of plain error review.
¶ 59. Under the plain error doctrine, this Court may notice error though the error was "not identified or distinctly specified" in the appellate briefs or though the error was not preserved for appeal. M.R.A.P. 28(a)(3); Bryant v. State, 844 So.2d 1153, 1155(¶ 5) (Miss.2003). We will notice a plain error pursuant to our inherent power to prevent a manifest miscarriage of justice. State Highway Comm'n v. McDonald's Corp., 509 So.2d 856, 863 (Miss.1987). "The plain error doctrine has been construed to include anything that `seriously affects the fairness, integrity or public reputation of judicial proceedings.'" United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To find plain error, this Court must conclude that the trial court deviated from a legal rule, that the error was plain, clear, or obvious, and that the error prejudiced the outcome of the trial. Cox v. State, 793 So.2d 591, 597(¶ 34) (Miss.2001).
¶ 60. In its appellate brief, UMC attacks the reliability of Dr. Sykes's expert opinions, arguing that (1) Dr. Sykes ignored the necessary element of cardiovascular dysfunction in rendering his opinions;[12] (2) no foundation of reliable data or methodology was established to support Dr. Sykes's opinions, and (3) Dr. Sykes's opinions were not based on the medical records. The majority thoroughly evaluates each of these arguments and concludes that no plain error occurred. However, the plain error doctrine should not function as a vehicle for entertaining every procedurally barred appellate argument. Such arguments should be considered only if the record evinces that plain, clear, or obvious error occurred below. A review of the record in this case indicates that no plain, clear, or obvious error occurred in the admission of Dr. Sykes's expert testimony pursuant to Rule 702. The record does not contain any indication that the trial court failed to correctly perform the modified Daubert analysis required by Mississippi Transportation Commission v. McLemore, 863 So.2d 31, 39(¶ 23) (Miss. 2003). Because no challenge to Dr. Sykes's opinions was made below, no information surrounding the trial court's decision was developed in the record. Nor is it plain, clear, or obvious from Dr. Sykes's testimony that the trial court abused its discretion by finding his testimony to be relevant and reliable pursuant to Rule 702. I believe the majority's disposition of this issue will only encourage more litigants to foist procedurally barred issues before this Court in the guise of "plain error" in an attempt to secure what actually amounts to full appellate review.
¶ 61. Other considerations are implicated by the majority's entertainment of UMC's procedurally barred arguments. This Court most frequently applies plain error analysis in criminal appeals, often involving indigent defendants who were represented at trial by appointed counsel. This is a civil case in which UMC was ably represented by its hired counsel. Certainly, *638 UMC's failure to challenge Dr. Sykes's opinions at trial was a strategic decision, not an oversight. It was not until after the adverse verdict that UMC decided to attack Dr. Sykes's opinion testimony. Because that attack was not made at the trial level, Peacock had no opportunity to combat UMC's arguments with evidence supporting the reliability of Dr. Sykes's opinions. I believe the majority errs by responding to UMC's unpreserved arguments in this appeal because the record evinces no plain, clear, or obvious error in the admission of Dr. Sykes's testimony.
B. The trial court's fact-findings.
¶ 62. On review of the outcome of a bench trial, after reviewing the entire record, we will affirm if the judge's findings of fact are supported by substantial, credible evidence and are not manifestly wrong or clearly erroneous. City of Jackson v. Perry, 764 So.2d 373, 376(¶ 9) (Miss.2000). The trial court's fact-findings "are ordinarily safe on appeal where the record includes substantial supporting evidence." Omnibank of Mantee v. United S. Bank, 607 So.2d 76, 82 (Miss.1992). On review, we must accept the evidence supporting or reasonably tending to support the trial court's findings of fact, together with all reasonable inferences to be drawn therefrom. Id. If the trial court neglected to make all the findings prerequisite to its judgment, we assume that the court resolved the remaining issues consistent with its judgment. Id.
¶ 63. As found by the majority, the trial court substantially adopted the proposed findings of fact and conclusions of law submitted by Peacock. In this scenario, our deference to the trial court's fact-findings is lessened. Id. at 83 (citing Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1266 (Miss.1987)). We "view the challenged findings of fact and the appellate record as a whole with a more critical eye to ensure that the trial court has adequately performed its judicial function." Rice Researchers, 512 So.2d at 1265. Nonetheless, we must be mindful that the decision to adopt a party's proposed findings of fact and conclusions of law is a matter within the trial court's sound discretion. Id. at 1266. In the present case, in adopting Peacock's proposed findings of fact and conclusions of law, the trial court determined that those findings and conclusions were supported by substantial evidence. Stark v. Anderson, 748 So.2d 838, 841(¶ 6) (Miss.Ct.App.1999). Even applying our more stringent standard of review, we must affirm the trial court if its findings were supported by substantial, credible evidence in the record. Id. I believe that there was substantial, credible evidence to support the fact-findings that were material to the lower court's ultimate conclusion of medical negligence and that this Court errs by reversing and remanding for further fact-findings.
¶ 64. To summarize the trial testimony and the parties' positions in this case, there was no dispute that when Peacock was initially admitted at UMC, Dr. Borman acted within the standard of care by electing to manage Peacock's grade four liver laceration non-operatively. The object of the treatment was to allow pressure to build in Peacock's abdomen that would cause a blood clot to form, stopping the bleeding. By July 1, his condition had improved. But on July 2 or 3, Peacock's condition worsened, and at some point he developed multiple system organ failure that caused his death on July 8. UMC's expiration summary report on Peacock reflected that Peacock experienced increasing intra-abdominal pressures during his stay at UMC.
¶ 65. The disagreement between the parties was as to the cause of Peacock's *639 multiple system organ failure. Dr. Sykes, testifying for the plaintiff, opined that Peacock's multiple system organ failure had been caused by abdominal compartment syndrome, a disease process in which abdominal pressure "builds to such a degree that other vital conditions are interfered with," resulting in death if the pressure is not relieved. Dr. Sykes testified that, pursuant to the standard of care, UMC should have noticed on July 2 that Peacock's clinical picture was indicative of abdominal compartment syndrome. Dr. Sykes opined that, on July 2, UMC breached the standard of care by failing to measure Peacock's bladder pressure, which would have confirmed abdominal compartment syndrome, or by failing to perform a laparotomy to relieve the abdominal pressure. Dr. Sykes testified that, after July 2, Peacock's symptoms of abdominal compartment syndrome continued to worsen, obligating UMC to have treated his condition by performing a laparotomy. Dr. Sykes opined that, due to the failure to perform a laparotomy, Peacock's abdominal compartment syndrome caused multiple system organ failure. He opined that a laparotomy should have been performed despite Peacock's positive blood culture of July 3.
¶ 66. Dr. Borman, on the other hand, testified that Peacock's multiple organ system failure had been caused by Systematic Inflammatory Response Syndrome (SIRS) or by sepsis, which he had most probably acquired when bacteria present on his skin or in the hospital entered his body through an intravenous line, catheter, or tube. Dr. Borman was Peacock's treating physician. Dr. Borman testified that she diagnosed Peacock with sepsis based upon his clinical picture and upon a July 3 blood test that revealed bacteria in his bloodstream. Dr. Borman testified that sepsis is one of the risks of being hospitalized in the SICU. Dr. Borman testified that a laparotomy is not appropriate for a septic patient unless the source of infection is located in the abdomen. She testified that she ordered a CT scan of Peacock's abdomen which showed no source of infection in the abdomen. Dr. Borman and Dr. Newt Harrison, a resident who was involved in Peacock's treatment, both testified about abdominal compartment syndrome, which testimony will be discussed below.
¶ 67. From this summarization of the testimony, it may be seen that the task before the trial court was to determine whether sepsis or abdominal compartment syndrome caused Peacock's deadly multiple system organ failure and, if the cause was abdominal compartment syndrome, whether UMC breached the standard of care in treating Peacock and whether that breach proximately caused his death. Because in this case I believe it is beneficial to view the contested fact-findings in context, I quote from the relevant part of the trial court's opinion:
Robert Peacock arrived at University Medical Center at approximately 9:15 a.m. on June 26, 1999. A CT scan of his abdomen was undertaken which revealed a grade IV laceration of his liver with free fluid in his abdomen. Robert Peacock was admitted to the Surgical Intensive Care Unit (SICU). He was intubated at 21:20 on June 27, 1999, and was continuously administered intravenous fluids during his stay in the SICU. While he was a patient at University Medical Center, his abdomen became increasingly distended. During his stay in the SICU, Robert Peacock was sedated with Ativan and Morphine, but he continued to communicate regarding abdominal pain.
Dr. Borman was a professor of surgery at UMMC at the time of the admission of Robert Peacock on June 26, 1999, and was at all times acting in and about *640 the duties of her employment with UMMC at the time she treated Robert Peacock. On July 2, 1999, Dr. Borman noted in UMC's medical records that Robert Peacock "should be okay from liver injury standpoint." A possible diagnosis of "abdominal compartment syndrome" was considered by his health care providers at University Medical Center. His intra-abdominal pressure was first measured to be 20-22 on July 3, 1999. His intra-abdominal pressure increased to 37-38 on July 4, 1999. At that time, Robert Peacock's renal function was failing. He had no urine output and his creatinine and potassium levels were elevated to dangerously high levels. He was ultimately diagnosed with multiple organ failure.
Dr. Leon Sykes, accepted by the court as an expert witness in the field of surgery and surgery critical care, testified that Robert Peacock had "abdominal compartment syndrome" based upon the presence of increased peak inspiratory pressure, oliguria (lack of urine output) and abdominal distension, confirmed by very high bladder pressures. Dr. Sykes testified that the standard of care required that measures be taken to reduce intra-abdominal pressure. He opined that if the intra-abdominal pressure were not reduced, Robert Peacock would suffer multiple organ system failure, which, in fact, occurred. Dr. Sykes further opined that failure to measure bladder pressure on July 2, 1999, when Robert Peacock's peak inspiratory pressure was elevated, compounded by taking no measures to decompress the abdomen in the face of oliguria and deteriorating renal function was a breach of the standard of care. Dr. Sykes further opined that Robert Peacock had "abdominal compartment syndrome" which resulted directly in respiratory failure, renal failure and multiple organ system failure.
Evidence at the trial defined abdominal compartment syndrome as a condition in which pressure in the abdomen builds to such a degree that other vital processes are interfered with. The type of injury Robert Peacock sustained causes a build-up of fluid in the abdomen. Testimony further revealed that if abdominal compartment syndrome is not addressed, the patient will die, and the standard of care required a laparotomy to be undertaken to relieve the patient's intra-abdominal pressure. On July 4, 1999, the University Medical Center diagnosed Robert Peacock's problem as "abdominal compartment syndrome." At that time he had ongoing prolonged oliguria, high peak inspiratory pressures in the high 40's and into the 50's, bladder pressure in the mid-30's, and he was acidotic due to his not being well-perfused (blood was not reaching his organs to deliver oxygen to remove waste). The plaintiff alleges that untreated "abdominal compartment syndrome" caused Robert Peacock to die. UMC's original approach which consisted of conservative non-surgical treatment was within the standard of care. However, the plaintiff contends that once Robert Peacock developed abdominal compartment syndrome interfering with the function of his other organs, the standard of care required that the abdominal compartment syndrome be addressed and the pressure be relieved. Based upon the expert testimony herein, the Court agrees with the plaintiff's contention.
Dr. Newt Harrison, a general and vascular surgeon and resident at University Medical Center, treated Robert Peacock. Dr. Harrison believed that during the first week of July, 1999, Robert Peacock's condition started deteriorating. Dr. Harrison informed David Peacock that "[his father] was going to possibly *641 need an exploratory laparotomy for what he believed was abdominal compartment syndrome . . ." The defense contends that, although Robert Peacock suffered from abdominal compartment syndrome, it was managed appropriately. Dr. Borman agreed that "once his pressure reached a certain level there is no question that he would die without an operation . . ." Dr. Borman did, however, feel that Robert Peacock had abdominal compartment syndrome. Defendant's position is that due to Robert Peacock's condition of multiple organ failure and sepsis that is was not possible to perform a laparotomy on Robert Peacock and that the risks of a laparotomy outweighed the benefits. Dr. Borman admitted, however, that on July 2, 1999, it was possible to perform a laparotomy on Robert Peacock that would have lowered his intra-abdominal pressure at a time when there was no multi-system organ failure or sepsis. Dr. Claude Minor, defendant's expert, not only disagreed with Dr. Sykes, he also disagreed with Drs. Borman and Harrison. Dr. Minor opined that Robert Peacock did not have abdominal compartment syndrome.
. . . .
Plaintiff presented sufficient, competent, and credible expert testimony at trial to establish (a) the standard of care for health care providers who treated Robert Peacock; (b) that the health care providers deviated from that standard; (c) that their deviation from the standard of care was the proximate cause of Robert Peacock's death; and (d) that Robert Peacock was injured as a result of their negligence.
¶ 68. The majority concludes that this opinion included several erroneous fact-findings that rendered the trial court's entire decision clearly erroneous. I disagree, and discuss each fact-finding below.
1. Testimony further revealed that if abdominal compartment syndrome is not addressed, the patient will die, and the standard of care required a laparotomy to be undertaken to relieve the patient's intra-abdominal pressure.
¶ 69. The majority states that this fact-finding meant that the standard of care required a laparotomy to be undertaken in this case to relieve Peacock's intra-abdominal pressure, and finds that there was not substantial evidence supporting the finding that a laparotomy would have relieved Peacock's abdominal pressure. The majority finds that Dr. Sykes's testimony "may have been sufficient" to support this finding. It is elementary that Dr. Sykes's expert testimony that a laparotomy would have relieved Peacock's abdominal pressure was fully sufficient to provide substantial support for this finding.
¶ 70. The majority concludes that this finding was error because in making the finding the court necessarily relied upon another erroneous finding that Dr. Borman testified that she could have performed a laparotomy on July 2, 1999, that would have relieved the intra-abdominal pressure. However, because Dr. Sykes's testimony was without question sufficient to support the finding that a laparotomy would have relieved the pressure, this Court cannot say the lower court necessarily relied upon any of Dr. Borman's testimony in order to make this finding. The trial court could have rejected Dr. Borman's opinion testimony in toto and, based on the testimony of Dr. Sykes, had substantial evidence to find that a laparotomy would have relieved Peacock's abdominal pressure. Therefore, I perceive no error in this fact-finding.
2. Defendant's position is that due to Mr. Peacock's condition of multiple organ *642 failure and sepsis that it was not possible to perform a laparotomy on Mr. Peacock and that the risks of laparotomy outweighed the benefits. Dr. Borman admitted, however, that on July 2, 1999, it was possible to perform a laparotomy on Robert Peacock that would have lowered his intra-abdominal pressure at a time when there was no multi-system organ failure or sepsis.
¶ 71. According to the majority's characterization, this was a finding that Dr. Borman admitted that UMC was at fault in failing to perform a laparotomy on July 2. The majority states that this finding "suggests that Dr. Borman would not perform a laparotomy on Peacock due to the presence of sepsis, but then that she contradicted herself by stating that she could have performed the operation before the sepsis was present." Then, the majority concludes that because Dr. Borman's testimony was not in fact contradictory, this finding "placed an improper slant on Dr. Borman's testimony."
¶ 72. With all due respect to the majority, in my opinion the majority is able to find error in this fact-finding only by construing the language of this fact-finding against the appellees. It is readily apparent from the testimony of Dr. Borman quoted in the majority opinion that, as the trial court found, Dr. Borman did admit that it was possible to have performed a laparotomy on July 2. She further testified, as found by the trial court, that a laparotomy would have lowered elevated intra-abdominal pressures. There was really no dispute among the parties that UMC could have performed a laparotomy on Peacock at any time and that an effect of a laparotomy is that it lowers abdominal pressure. What was disputed was whether the standard of care demanded that a laparotomy be performed on Peacock given his situation. Dr. Borman testified that, while it was possible to have performed a laparotomy, performing a laparotomy was contra-indicated because of Peacock's sepsis. Dr. Borman testified that a laparotomy would have had no clear value to Peacock. Dr. Borman's opinion that a laparotomy on July 2 was contra-indicated had no bearing on Dr. Borman's testimony that it was possible to perform a laparotomy on Peacock on July 2 and that doing so would have relieved intra-abdominal pressure.
¶ 73. It is true that Dr. Borman did not testify that there was no sepsis present on July 2, 1999. Instead, she testified that there may have been sepsis present on that date. Nonetheless, our deferential standard of review demands that we construe the trial court's findings in the light most favorable to the appellee. The language of the finding was "Dr. Borman admitted, however, that on July 2, 1999, it was possible to perform a laparotomy on Robert Peacock that would have lowered his intra-abdominal pressure at a time when there was no multi-system organ failure or sepsis." It is unclear from the trial court's statement whether the court regarded "at a time when there was no multi-organ failure or sepsis" as a part of Dr. Borman's admission or whether this was a finding of fact that July 2 was "a time when there was no multi-organ failure or sepsis." This is the type of ambiguity that this Court is required to construe in favor of the trial court's decision.
3. Dr. Borman did, however, feel that Robert Peacock had abdominal compartment syndrome.
¶ 74. The majority finds that the evidence did not substantially support the trial court's finding that Dr. Borman felt that Peacock had abdominal compartment syndrome. The majority relies on Dr. Borman's trial testimony. Dr. Borman testified on cross-examination:

*643 Q. You agree with Dr. Sykes that Mr. Peacock developed abdominal compartment syndrome?
A. I agree that prior to his death he had abdominal compartment syndrome pressureslevels that are consistent with abdominal compartment syndrome. I think that Dr. Sykes has attributed many things of Mr. Peacock solely to that one condition. I disagree with him that that was the major condition that produced those organ failures.
There were other explanations for those that I find credible and those are the ones on which we based Mr. Peacock's treatment. So I guess my answer to you is I agree that the pressure of 37 that was documented later is an abnormal pressure.
On redirect examination, Dr. Borman stated that "some of the organ change could be in part due to the pressure. The underlying process and the majority of this process was sepsis and SIRS."
¶ 75. In my opinion, Dr. Borman's testimony undoubtedly was substantial support for a finding that Dr. Borman felt that Peacock had abdominal compartment syndrome. There was no dispute that abdominal compartment syndrome was, definitively, a disease process in which pressure increases in the abdominal cavity. Thus, the trial court could find that Dr. Borman's opinion that prior to Peacock's death he had "abdominal compartment syndrome pressures" equated with an opinion that Peacock had abdominal compartment syndrome. And, certainly, "that one condition" referred to the condition under discussion, abdominal compartment syndrome. Given a reasonable reading, Dr. Borman's testimony signified that Dr. Borman felt Peacock had abdominal compartment syndrome, but that abdominal compartment syndrome was not "the major condition that produced those organ failures." And, contrary to the majority's characterization of Dr. Borman's testimony, Dr. Borman did not state that Peacock's elevated pressure could have come from other causes. Rather, Dr. Borman indicated that Peacock's organ failures came from other causes than the abdominal pressure, namely, sepsis and SIRS. The majority's argument misconstrues Dr. Borman's testimony and fails to afford due deference to the trial court's role as the finder of fact.
¶ 76. Moreover, other record evidence supported the trial court's finding that Dr. Borman felt Peacock had abdominal compartment syndrome. Dr. Harrison stated that, around the first week of July, "we . . . felt . . . he was possibly going to need an exploratory laparotomy for what we felt was Abdominal Compartment Syndrome." Dr. Borman was Peacock's treating physician, and the trial court could have found from Dr. Harrison's testimony that Dr. Borman felt Peacock had abdominal compartment syndrome.
4. [Peacock] had no urine output [on July 4, 1999].
¶ 77. The majority finds that the trial court erred by finding that Peacock had no urine output on July 4, 1999, because all of the evidence showed that Peacock actually had low urine output on July 4, 1999. I agree that the evidence did not substantially support a finding of no urine output on July 4, 1999. Nonetheless, the impact of this error on the trial court's decision and other attendant fact-findings was negligible at best. It was undisputed that Peacock developed oliguria, or low urine output, and that he had oliguria on July 4, 1999. The trial court recognized that Peacock suffered from oliguria. The trial court accepted the testimony of Dr. Sykes that Peacock's oliguria was symptomatic of abdominal compartment syndrome and that Peacock had abdominal compartment *644 syndrome. The trial court's erroneous statement that Peacock had zero, as opposed to low, urine output on July 4, 1999, was an inconsequential error that does not merit reversal.
5. On July 4, 1999, the University Medical Center diagnosed Peacock's problem as "abdominal compartment syndrome."
¶ 78. The majority finds no evidence in the record to substantially support the trial court's finding that, "on July 4, 1999, the University Medical Center diagnosed Peacock's problem as `abdominal compartment syndrome.'" The majority quotes from the deposition testimony of Dr. Harrison:
On thearound the first week of July, the patient's clinical condition started deteriorating and things were done to try to curtail that, and it waseventually came to the point where we had talked to the patient about dialysis asa probable need for dialysis, as well as we felt to behe was going to possibly need an exploratory laparotomy for what we felt was abdominal compartment syndrome and he was going to require long-term ventilatory support, multiple operations.
Dr. Borman testified that the need for a laparotomy and dialysis was communicated to David Peacock on July 5, 1999. Dr. Borman communicated to David Peacock that, even with a laparotomy and dialysis, Peacock would need long-term ventilatory support and multiple operations, and that Peacock probably would not survive. David Peacock testified that, based on the information communicated by Dr. Borman, he signed a Do Not Resuscitate order on July 5.
¶ 79. In my opinion, Dr. Harrison's statement that "we . . . felt he was going to possibly need an exploratory laparotomy for what we felt was abdominal compartment syndrome" was substantial support for the trial court's finding that UMC had diagnosed Peacock with abdominal compartment syndrome. The trial court could reasonably infer that the word "felt" was indicative of a diagnosis, in other words, the problem from which UMC thought Peacock was suffering. Further supporting that conclusion is Dr. Harrison's testimony that it was felt that Peacock needed an exploratory laparotomy for the abdominal compartment syndrome. Moreover, Dr. Borman's testimony, discussed above, substantially supports the conclusion that UMC had diagnosed Peacock with abdominal compartment syndrome.
¶ 80. The majority reasons from the use of "exploratory laparotomy" that UMC could not have diagnosed Peacock with abdominal compartment syndrome. The majority states that "the fact that the laparotomy was qualified as exploratory indicates that the doctors were not yet sure of the cause of Mr. Peacock's condition. . . ." The majority further states, "[i]f the doctors were already sure of the diagnosis, there certainly would have been no need for an exploratory surgery." These statements incorrectly assume that the objective of an exploratory laparotomy would have been diagnostic. The meaning of the medical term "exploratory laparotomy" was not developed in the trial court. It was established that a laparotomy was the treatment for abdominal compartment syndrome, and the objective of an exploratory laparotomy reasonably could have been to treat Peacock's abdominal compartment syndrome and to investigate the consequences of Peacock's abdominal compartment syndrome. The majority errs by assigning, on a silent record, a meaning to the term "exploratory laparotomy" that conflicts with the judgment. The meaning of the term is far from clear; therefore, we must defer to the trial court's assessment.
*645 ¶ 81. The majority also finds error in the court's finding that July 4, 1999, was the date of the abdominal compartment syndrome diagnosis. The record reveals no date of diagnosis. However, Dr. Harrison testified that he became involved with Peacock's treatment on July 3. Dr. Borman testified that the need for a laparotomy was communicated to David Peacock on July 5. The medical records reveal that UMC was considering abdominal compartment syndrome on July 4. The evidence favoring the judgment shows that Peacock's symptoms of abdominal compartment syndrome became more pronounced between July 2 and his death. The trial court did not manifestly err in finding that a diagnosis of abdominal compartment syndrome was made, and there was enough evidence to enable the court to infer that the diagnosis was made on July 4. This is the kind of reasonable inference from the evidence that the trial court is permitted to make in its role as the fact-finder, a role that this Court may not subsume.
6. Absence of fact-findings on other risk factors.
¶ 82. The majority suggests that the trial court, on remand, should make fact-findings concerning Peacock's other risk factors for surgery, such as his alcoholism, age, smoking habit, psoriasis, and medications. As the trial court did not explicitly make any fact-findings concerning these factors, we must assume that the trial court resolved this issue in a manner consistent with its judgment. Omnibank of Mantee, 607 So.2d at 82. The absence of explicit fact-findings on the other risk factors does not merit our reversal for further findings.
C. Conclusion
¶ 83. I believe that the trial court's decision was supported by substantial evidence and was not clearly erroneous. Therefore, I would affirm.
IRVING, J., Joins This Opinion.
NOTES
[1] "For claims and causes of action arising from governmental negligence, the maximum damage award on and after July 1, 2001, is $500,000." Miss.Code Ann. § 11-46-15(1)(c) (Rev.2002).
[2] Inspiratory pressures are pressures measured through a ventilator.
[3] Sepsis is an overreaction of the body to infection, which leads inevitably to organ failure. It carries a high mortality rate when developed.
[4] UMC has not advanced this argument on appeal.
[5] Oliguria is abnormally low urine output.
[6] There appears to be no dispute that Peacock's cardiac output was normal.
[7] As part of his explanation of abdominal compartment syndrome, Dr. Minor testified on direct:

Measuring pressures doesn't always help you. The measuring of pressures are supportive data only. In other words, you say I think this patient has compartment syndrome. You measure the pressure and the numbers vary but they say greater than 25 millimeters of mercury. And then you turn around and say, okay, they've got cardio-vascular compromise, they've got renal compromise, they've got oliguria; maybe this is a compartment syndrome.
(Emphasis added). It was not until cross examination that Dr. Minor stated:
I don't know what Dr. Sykes' standard is. My standard is, first of all, you have to show that there is organ dysfunction. Once you show that there's organ dysfunction, you've got to measure the compartment pressures and show that they indeed are elevated. And along with that you've got to demonstrate cardiovascular dysfunction. You've got to demonstrate renal dysfunction and ventilatory dysfunction. Sometimes though the renal dysfunction is not always present. In addition to that, I have operated on people with pressures of less than 25 millimeters of mercury based on my clinical suspicion.
By the way, in this particular patient's case it is interesting that when they put a Swans-Ganz in he had excellent cardiac parameters. He had no cardiac dysfunction. So that criteria falls by the wayside also in regard to Mr. Peacock.
(Emphasis added).
[8] We agree with the dissent that if Dr. Sykes had testified "that a laparotomy would have relieved Peacock's abdominal pressure" this testimony, in and of itself, would have been sufficient to provide substantial support for the trial court's finding. However, we find Dr. Sykes's testimony to be much more vague. Dr. Sykes testified, on several occasions, that the standard of care required that UMC take Peacock to the operating room to decompress his abdomen. No where does Dr. Sykes opine that the pressure would have been relieved in this case.
[9] This statement contrasts starkly with the plaintiff's proposed finding of fact, adopted verbatim by the trial court, that UMC diagnosed Peacock with abdominal compartment syndrome on July 4.
[10] Dr. Sykes, of course, was of the opinion that Peacock developed abdominal compartment syndrome and that the failure to treat this condition was the proximate cause of Peacock's death.
[11] This purported conflicting testimony appears to have weighed heavily in the plaintiff's proposed findings of fact which found UMC liable. The plaintiff states in his brief that Dr. Minor's testimony regarding the non-existence of abdominal compartment syndrome "was contradictory to that of Dr. Sykes and UMC's two other physicians, Dr. Borman and Dr. Harrison. It is apparent that the Circuit Judge clearly observed this contradiction, and, as is within his discretion, weighed the testimony of Drs. Sykes, Borman and Harrison against that of Dr. Minor." (Emphasis added). If this manufactured "disagreement" between the experts is truly the basis on which the trial judge rested his determination of credibility among the experts, then it is clear that the plaintiff misled the trial court and caused it to make erroneous findings of fact.
[12] I note that the necessity of that element was attested to by the competing expert testimony of Dr. Claude Minor and that this issue was a matter of weight, not admissibility.