WELCH, Judge.
The appellant, Eric Payne, was indicted for the intentional murder of his eight-month-old *1174 daughter, J.P., an offense defined as capital by § 13A-5-40(a)(15), Ala. Code 1975. He was convicted of the lesser-included offense of intentional murder, a violation of § 13A-6-2, Ala. Code 1975, and was sentenced to life imprisonment.
The State's evidence tended to show the following. At around 4:30 p.m. on June 11, 2013, paramedics were dispatched to Eric Payne's apartment off Old Shocco Road in Talladega in response to a 911-emergency telephone call. David White, a paramedic with NorthStar Emergency Services, testified that when he and fellow paramedic Ken Jones arrived at the apartment two police officers were performing CPR on a small child, J.P., in the living-room area of the apartment. One officer handed J.P. to him. J.P., he said, was in cardiac arrest, was not breathing, and had no pulse. White testified that Payne told him at the scene that J.P. had fallen off a bed earlier that day, that Payne had given J.P. Motrin brand pain reliever, and that J.P. then stopped breathing. White testified that CPR was performed on J.P. until the ambulance arrived at Citizens Hospital. J.P. was then transported via a helicopter to the Children's Hospital in Birmingham and was later pronounced dead. The coroner testified that J.P. died of blunt-force trauma to her head and neck, that she had a skull fracture, that she had multilayered retinal hemorrhages, and that she had injuries to her ribs.
Debbie Hurst testified that she lived in an apartment next to Payne and Payne's girlfriend, Kyeandrea Barclay, and that they all became friends. Early on the morning of June 11, 2013, at around 9:00 a.m., Payne and Hurst's boyfriend, Terry Spratlin, and Darnell Huddleston, Hurst's former sister-in-law, came to her apartment. Hurst said that they talked and smoked marijuana. Several times during the day, Hurst said, she asked Payne where J.P. was and Payne told her that she was in his apartment asleep. She also asked Payne to check on J.P., Hurst said, and Payne left her apartment and came back about five minutes later and said that J.P. was asleep. Hurst testified that Payne was acting strange that day. At around 3:45 p.m., Hurst said, Payne said that he had to get ready for work, and he went back to his apartment. He came back shortly thereafter, she said, and told her that "something was wrong with his baby." (R. 177.) Hurst testified that she and Spratlin went to Payne's apartment. She testified:
"J.P. was laying on the couch, and her head was swollen, and her eyes [were] like protruded out of her head. I lifted her eyelid because I worked for an ophthalmologist. She was not breathing. She had no air in or out. I could not find a pulse, and I told them to call 911."
(R. 177.) She talked to the 911 operator, Hurst said, and put the baby on the floor and tried to perform CPR. Hurst further testified that she saw J.P. the day before and that J.P. had been happy and laughing that day.
Vickie Walker, an emergency-room nurse at Citizens Hospital, testified that she was working on the afternoon that J.P. was brought into the emergency room and that she took J.P. to the critical-care unit. She said that J.P. was lifeless, that she had no pulse, that she had no respirations, and that she was showing no signs of life. (R. 212.) Walker testified that hospital personnel tried to shock J.P.'s heart "but we were unable to get a heart rate back at that initial shock. And we continued CPR again to try to circulate the blood through the body. Shocked again, and finally that baby got a little pulse, and we began to work with that." (R. 214.) J.P. was then transferred to Birmingham. Walker testified that she spoke to Payne about what *1175 happened and he told her that "the baby was lying on his lap and fell on the floor and hit her head" and that Payne had given J.P. ibuprofen. (R. 215.)
The State presented the testimony of five physicians who had treated or performed the autopsy on J.P. All testified that J.P.'s injuries were not consistent with falling from a bed because, they said, the injuries were too severe.
In his defense, Payne presented the testimony of Dr. Peter Stephens, a doctor certified in anatomic pathology, clinical pathology, and forensic pathology. Dr. Stephens testified that J.P. died as a result of falling off a bed and that her injuries were consistent with a vitamin D deficiency. (R. 619.)
Eric Payne testified in his own defense. He said that he arrived at his apartment from work at around 5:00 a.m. on the morning of June 11, 2013, and that J.P. was restless and that he tried to calm her down. He said that he fell asleep in his bed with J.P. on his chest and that when he woke J.P. was on the floor crying. Payne said that he did not notice that J.P. had any injuries and that he gave her some ibuprofen. He said that, when she started to fall asleep, he put her in her playpen and started doing "little things around the house." (R. 692.) A little while later he heard his neighbor's nephew, Britton, pull up outside because the music in his car was loud.
"I went out there with Britton, and we were talking about music, and I don't know how much time had passed because I was not looking at the clock; neither do I have a clock in my house. So some time had passed by before Britton had asked me-he was like, 'Hey, man, where is the baby?' I said, 'Hold on, let me go check on her,' proceeded in to check on her as I always do, and I went in. I just rubbed her on the back, and she moved a little bit like she normally do, and I went back outside, I said, 'Man, she asleep.' "
(R. 693.) He talked some more with Britton, Payne said, and then went back to check on J.P. a second time.
"Okay. After the second time when I checked on [J.P.], then we were all talking, and we eventually ended up walking into Deb's [Hurst's] house following the conversation. I left my door open, as I always do just in case [J.P.] starts crying, I can come back home and check on her. Because me and Deb's house is so close together, it is kind of no need for a baby monitor because I can be my own baby monitor because I can hear just fine and I can hear when my baby wakes up. So I left the door open, and I left Deb's door open, and Deb fed me hot dogs."
(R. 696.) Payne said that he went back to his apartment at around 4:00 p.m. and found that J.P. was unresponsive and was limp. He tried CPR and then went to Hurst's apartment for help. Hurst came over, he said, and he telephoned 911.
Payne raises only one issue on appeal to this Court. He argues that the circuit court erred in allowing five physicians to testify concerning the cause of J.P.'s injuries and that the circuit court erred in not applying the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), standard of admissibility to the five physicians' testimony. In essence, Payne challenges the reliability of that testimony and not its relevance.
The record reflects that Payne moved in limine that the State be "barred from entering any evidence, or eliciting any testimony from physicians or other witnesses, regarding the scientific probability of certain injuries sustained by the alleged victim...." (C. 103.) The circuit court considered *1176 and denied the motion after each doctor was questioned by defense counsel on voir dire. (R. 368, 411, 447, 490, and 519.)
In Alabama, the admission of expert testimony is governed by Rule 702, Ala. R. Evid. Effective January 1, 2012, the Alabama Supreme Court amended Rule 702, Ala. R. Evid., to mirror the comparable Federal Rule of Evidence. 1 Rule 702, Ala. R. Evid., now reads:
"(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
"(b) In addition to the requirements in section (a), expert testimony based on a scientific theory, principle, methodology, or procedure is admissible only if:
"(1) The testimony is based on sufficient facts or data;
"(2) The testimony is the product of reliable principles and methods; and
"(3) The witness has applied the principles and methods reliably to the facts of the case."
Section 12-21-160, Ala. Code 1975, also provides:
"(a) Generally. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
"(b) Scientific evidence. In addition to requirements set forth in subsection (a), expert testimony based on a scientific theory, principle, methodology, or procedure is only admissible if:
"(1) The testimony is based on sufficient facts or data,
"(2) The testimony is the product of reliable principles and methods, and
"(3) The witness has applied the principles and methods reliably to the facts of the case."
The Alabama Court of Civil Appeals, in discussing the 2012 amendment to Rule 702, Ala. R. Evid., stated:
"The intent of the amendment was to provide additional criteria for a trial court to consider when an opposing party properly challenges the qualifications of a proposed expert witness by applying a process and procedure similar to the process and procedure established by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)."
*1177 Colbert Cty. Northwest Alabama Health Care Auth. v. RegionalCare Hosp. Partners, Inc., 195 So.3d 948, 960 (Ala. Civ. App. 2015). "The amendment requires trial judges to act as 'gatekeepers' and determine whether the scientific evidence is both 'relevant and reliable.' See Daubert [v. Merrell Dow Pharmaceuticals, Inc. ], 509 U.S. [579] at 597 [ (1993) ]." Advisory Committee's Notes to Amendment to Rule 702 Effective January 1, 2012.
"To assist courts in evaluating the reliability of expert testimony, Daubert [v. Merrell Dow Pharmaceuticals, Inc. ], 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),] set forth a non-exclusive list of factors. Daubert, 509 U.S. at 593, 113 S.Ct. 2786. The specific factors articulated by Daubert are: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique or theory is generally accepted within the relevant scientific community; (4) the known or potential rate of error of the technique or theory when applied; and (5) the existence and maintenance of standards controlling application of the technique. Id. at 593-94, 113 S.Ct. 2786.
"No single Daubert factor is dispositive of the reliability of an expert's testimony, and not all of the Daubert factors will apply to 'all experts or in every case.' Kumho Tire [Co., Ltd. v. Carmichael ], 526 U.S. [137] at 141-42, 152 [ (1999) ] ; Fed. R. Evid. 702, advisory committee's notes, 2000 amendments; [State v.] Bernstein, 234 Ariz. [89] at 95, ¶ 12, 317 P.3d [630] at 636 [ (2014) ] ; see e.g., Tyus v. Urban Search Management, 102 F.3d 256, 263 (7th Cir. 1996) (stating that the Daubert factors did not precisely apply to the proffered sociologist's expert testimony). Moreover, courts since Daubert have identified other factors for judges to consider in determining reliability, including whether: (1) the expert's testimony is prepared solely in anticipation of litigation, or is based on independent research; (2) the expert's field of expertise/discipline is known to produce reliable results; (3) other courts have determined that the expert's methodology is reliable; and (4) non-judicial uses for the expert's methodology/science. Fed. R. Evid. 702, advisory committee's notes, 2000 amendments; Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167 ; Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3rd Cir. 2000) ; Daubert [v. Merrell Dow Pharmaceuticals, Inc. ], 43 F.3d [1311] at 1317 [ (9th Cir. 1995) ]."
State ex rel. Montgomery v. Miller, 234 Ariz. 289, 299, 321 P.3d 454, 464 (2014).
However, "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one." Daubert, 509 U.S. at 594-95, 113 S.Ct. 2786. "In some cases, the relevant reliability concerns may focus upon personal knowledge or experience of the Daubert factors and scientific foundation. Kumho Tire [Co., Ltd. v. Carmichael ], 526 U.S. [137] at 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 [ (1999) ]." Smart v. BNSF Ry., 52 Kan.App.2d 486, 495, 369 P.3d 966, 973-74 (2016).
As one court has stated:
"The United States Supreme Court has clarified the import of the Daubert factors, stating:
"The factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized *1178 by category of expert or by kind of evidence.
" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (quotations and citation omitted)."
Ratliff v. Commonwealth, 194 S.W.3d 258, 270 (Ky. 2006) (emphasis added).
The Mississippi Court of Appeals in University of Mississippi Medical Center v. Peacock, 972 So.2d 619, 627 (Miss. Ct. App. 2006), addressed whether the circuit court had erred in admitting expert testimony when no data or articles had been cited to support the expert's opinion. The court stated:
"[University of Mississippi Medical Center] contends that no foundation of reliable data or methodology was established to support Dr. Sykes's opinion as he 'did not rely on or even cite any scientific journals or studies supporting the parameters he considered in making the diagnosis [and] never stated that he had any personal experience in treating patients with abdominal compartment syndrome. ' As previously noted, the Daubert[ v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),] reliability inquiry is 'flexible,' with the trial court having " 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.' " [ Mississippi Transp. Comm'n v.] McLemore, 863 So.2d [31] at 37 (¶ 13) [ (Miss. 2003) ] (quoting Daubert, 509 U.S. at 594, 113 S.Ct. 2786 ; Kumho Tire [Co., Ltd. v. Carmichael ], 526 U.S. [137] at 152, 119 S.Ct. 1167 [ (1999) ], respectively)."
972 So.2d at 627.
"The [appellees] argue that [the doctor's] testimony is unreliable because '[e]xperience alone ... can never form the basis for expert testimony,' but this argument fails. Standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 1175-76, 143 L.Ed.2d 238 (1999). For nonscientific expert testimony, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.' Id. at 152, 119 S.Ct. at 1176. A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.' Id. at 150, 119 S.Ct. at 1175."
American General Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009).
With these principles in mind, we review the experts and their testimony. The following experts testified:
Dr. Michelle Kong
Dr. Michelle Kong, a physician employed at the Children's Hospital in Birmingham, testified that she had been licensed as a physician since 2005, that she had completed three years of training and residency in pediatrics, that she had completed an additional three years of training in pediatrics critical care, that she is certified by the American Board of Pediatrics for both pediatrics and pediatrics critical care, that she became certified in pediatrics in 2008, that she became certified in pediatrics critical care in 2010, that she completed her pediatric-critical-care fellowship at the University of Alabama at Birmingham, that she has lectured and written papers in her speciality of pediatric critical care, that she has had experience in treating child victims of abuse, that she had treated thousands of children who had been admitted as the result of accidents, that she has treated numerous children, *1179 but less than 100, who had been victims of child abuse, and that she had treated numerous children who had skull fractures.
Before the circuit court accepted Dr. Kong as an expert, Dr. Kong was questioned outside the presence of the jury. She stated that she relied on various journals related to pediatric critical care and critical-care medicine. When questioned about specific articles and studies, she stated that there are thousands of journals and hundreds of studies relating to pediatrics critical care. Dr. Kong stated:
"[S]o the process in taking care of this child in thinking about what we need to rule out or rule in is based on experience in the field. What we typically see and our experience is based on our foundation of knowledge that is based on what we know that is in the literature."
(R. 365.) Dr. Kong said that it was a regular part of her practice to make determinations as to the cause of injuries of children. (R. 368.)[2]
In accepting Dr. Kong as an expert, the circuit court stated:
"It is my job as the trial judge to make sure that the expert is an expert and that the testimony would be relevant and reliable as to the issues present in this case.
"An expert may be qualified on the basis of experience in certain fields. Experiences are [the] predominant basis for a great deal of reliable expert testimony. The Court finds that the expert-that the witness is an expert based upon her experience, which has led to her opinion.
"The Court has heard testimony concerning the expert's knowledge, skill, experience, training and education and finds that the witness is an expert. The subject matter of her testimony is within her field of practice. The expert has proven to have training and experience in dealing with the injuries to children similar to this child. The expert testified during the cause of-determining the cause of injury was part of her training or experience and a vital part of clinical medicine. The expert also testified that it was a regular part of her practice to make determinations as to the cause of injuries. The expert testified that her opinions were based on various tests, examinations, treatments given to the victim; that the expert indicated that she had referred to studies and literature in the field in reaching her conclusions. That the expert did consider other obvious causes of the victim's condition. The expert had firsthand knowledge of the victim's condition and that the testimony will assist the trier of fact in determining the relevant fact in the case, and the testimony is based on sufficient facts and reliable principles and methods, and she has reliably applied the same to the facts of this case.
"Based on the predicate laid by the district attorney in the case, and the questions asked by the defense counsel, the Court finds that the testimony of the witness is relevant and reliable and is admissible."
(R. 368-70.) Dr. Kong testified that it was her opinion that J.P.'s injuries-a retinal hemorrhage and extensive brain swelling-were not consistent with the history that she had been given and that J.P.'s *1180 injuries were more severe than what would have been caused by falling off a bed. Dr. Kong also testified that she asked an opthamologist to examine J.P.'s body to rule out any nonaccidental trauma.
Dr. Leslie Hayes
Dr. Leslie Hayes, a physician at Children's Hospital, testified that she took over J.P.'s care from Dr. Kong. Dr. Hayes testified that she obtained her medical license in 2001, that she specializes in critical-care pediatrics, that she has specialized in that field for 12 years, that she obtained her certification in pediatrics in 2003, that she obtained her certification in critical-care pediatrics in 2006, that she completed her residency in general pediatrics and general internal medicine, that she completed a three-year fellowship in critical-care pediatrics, and that she lectures and teaches in her field of expertise. Dr. Hayes was questioned on voir dire outside the presence of the jury. She testified that it was her regular practice in treating children to make a determination of the cause of the child's injuries. The circuit court found that her testimony was admissible for the same reasons it stated for Dr. Kong's testimony.
Dr. Hayes testified that when she first examined J.P. the child was brain dead. Dr. Hayes said that she performed various tests to determine the extent of brain activity and found that J.P. had extensive bleeding in and around the brain and that there was no brain activity. (R. 396.) Dr. Hayes testified that J.P.'s extensive injuries were not consistent with having fallen from a bed but were consistent with an unrestrained child having been ejected from a vehicle. (R. 414.)
Dr. Richard Martin
Dr. Richard Martin, a radiologist with Radiologist Associates, testified that he had been with Children's Hospital for 10 years, that he is licensed to practice medicine in Alabama and in Georgia, that after medical school he completed a five-year residency in general diagnostic radiology, that he completed an additional year of training in pediatric radiology at Emory in Atlanta, that he is board-certified in diagnostic radiology with an added qualification in pediatric radiology, that he is an assistant professor of radiology at the University of Alabama at Birmingham, that he lectures residents, that part of his five years of training in radiology concerned child abuse, that he is a member of the American College of Radiology, that in his career he had examined radiographs for approximately 200,000 children, and that he had examined numerous radiographs from children who were victims of child abuse. Dr. Martin was questioned outside the presence of the jury, and the following occurred during Dr. Martin's questioning by defense counsel:
"[Defense counsel]: And you stated that you reached a conclusion that [J.P.'s] injuries could not have been caused by the history that you received?
"[Dr. Martin]: I believe they were in excess of what would be generated from a fall from a bed.
"[Defense counsel]: Is that conclusion the product of reliable principles and methods?
"[Dr. Martin]: It is the product of my experience, my training, and what I have read in textbooks and articles over the years.
"[Defense counsel]: Can you tell me about the textbooks and articles?
"....
"[Dr. Martin]: Well, there's a Caffey's textbook, there's a-
"[Defense counsel]: Can you spell that?
"[Dr. Martin]: C-a-f-f-e-y. That's a book I have in my fellowship. I can't tell you a *1181 page number. Lane Donnelly has a review of pediatric radiology.
"[Defense counsel]: You said Donnelly?
"[Dr. Martin]: Lane Donnelly.
"[Defense counsel]: Is that a textbook also?
"[Dr. Martin]: It is.
"[Defense counsel]: Okay.
"[Dr. Martin]: I mean, there's a host of textbooks. There's a pediatric radiology book written by my mentor-in-training, Ed Burton.... I can't tell you a page number. It is a review in pediatric radiology.
"[Defense counsel]: Okay. If I were to look in these books, would I find information that says a fall from this height can cause this severity of fracture, but a fall from this height could not?
"[Dr. Martin]: I can give you some articles where if you want to see them ... but where a test dummy was rolled off a 27-inch bed and the force was not sufficient to cause a significant brain injury.
"I can get you another paper that says in-home falls less than six feet rarely cause injury. When they do, it is typically a small swelling. One to three percent of those may cause a small linear fracture ; and less than one percent of that one third percent can cause a hemorrhage, typically epidural, which in this case it wasn't; less likely subdural. When it is subdural it is confined to the small area of injury, not usually to the brain. I can show you a study where over ten years kids in an urban environment that fell from three stories or less all survived."
(R. 443-44.) The circuit court found that Dr. Martin was an expert in radiology and that his testimony was relevant and reliable. Dr. Martin testified that it was his opinion that the injuries that J.P. suffered were not consistent with having fallen off of a bed but were the result of severe trauma. (R. 449.)
Dr. Martin Cogen
Dr. Martin Cogen, the chief of pediatric ophthalmology at the Children's Hospital, testified that he had been at Children's Hospital for 11 years, that he had been practicing medicine for 26 years, that he is licensed in Alabama and in Georgia, that he graduated from medical school in 1983, that he completed a one-year internship in general internal medicine, that he completed a one-year internship in emergency medicine, that he completed a three-year ophthalmology residency at the Callahan Eye Foundation Hospital at the University of Alabama at Birmingham, and that he completed a one-year fellowship in pediatric ophthalmology. Dr. Cogen was questioned concerning his basis of knowledge, and the following occurred:
"[Defense counsel]: What medical literature that you may be relying on when making-when stating that opinion?
"[Dr. Cogen]: So there's a review article in pediatrics. If you would like I can quote the exact chapter and verse.
"[Defense counsel]: If you will just state the name of the study, name, and author and year.
"[Dr. Cogen]: So there are several references. There's one review article entitled, 'Retinal Hemorrhage and Abusive Head Trauma,' published by Alex Levin. That's in the Journal of Pediatrics.
"[Defense counsel]: What year is that?
"[Dr. Cogen]: 2010.
"[Defense counsel]: There's another article, which I think I gave you a copy of called 'Ophthalmic Findings in Suspected Child Abuse Victims.' That's published in the Journal of the American Academy of Ophthalmology, 2013. Do you know the author of that one?
*1182 "[Dr. Cogen]: The lead author has a hyphenated last name. It's Pierre, P-i-e-r-r-e, K-a-h-n, et al. And both of these list numerous references and they actually make reference to the difficulty in animal and experimental models to try to mimic the exact physical characteristics of a baby's eye.
"So I guess to try to answer your question as best I can, I'm aware of articles and studies that have been published dealing with the experimental nature of the forces required to cause retinal hemorrhages and vitreous base avulsion and retinal schisis and retinal folds, but I can't quote you the individual chapters and verses of those experiments, but they do exist.
"....
"[Defense counsel]: Did you base any part of your conclusion on Levin's study from 2012?
"....
"[Dr. Cogen]: The fact that the vitreous base avulsion in this particular case or any other case would be virtually pathognomonic of a quote, 'shaking' type of injury, yes."
(R. 488-90.) The circuit court, in allowing Dr. Cogen's testimony, stated:
"The subject matter of his testimony is within the doctor's field of practice. The expert has proven to have training and experience in dealing with eye injuries to children. The expert testified that his opinion was based upon test, examinations, and treatments, given to the victim. The expert indicated that he had referred to studies and literature in the field in reaching a conclusion. The expert did consider other obvious causes of the victim's condition. The expert had firsthand knowledge of the victim's condition. The testimony itself will assist the trier of fact in determining a relevant factor in the case. The Court finds that the testimony of the witness is relevant and reliable and is admissible."
(R. 490.) It was Dr. Cogen's opinion that the amount of damage to J.P.'s retinas and her multilayered retinal hemorrhaging were not consistent with a three-foot fall but were consistent with "shaken baby" or some type of violent back and forth movement.
Dr. Steven Dunton
Dr. Steven Dunton, senior medical examiner with the Montgomery office of the Department of Forensic Sciences, testified that he has been licensed to practice medicine since 1982, that he received his medical degree from the University of Texas, that he completed a three-year pediatrics residency at the University of Oklahoma, that he completed one year of speciality training in pediatrics at Emory University, that he completed a four-year residency in anatomic and forensic pathology, and that he is board-certified in forensic pathology, anatomic pathology, and pediatrics. Dr. Dunton was questioned by Payne outside the presence of the jury and the following occurred:
"[Defense counsel]: Do you base that conclusion on specific studies that support-studies that have been done regarding infants or children falling from varying heights?
"[Dr. Dunton]: Variety of literature over the years, both in journals, textbooks, and in the course of 25 years experience as a forensic pathologist and forensic pediatric.
"[Defense counsel]: Can you tall me today the names of any of those studies or literature or publications?
"[Dr. Dunton]: Off the top of my head, let's see, Greg Rieber, R-i-e-b-e-r, had a nice study concerning short distance falls....
*1183 "There have been studies concerning falls downstairs. David Chadwick out of San Diego writes quite a bit about head trauma and children and associated findings. If you looked at the indices in the American Journal of Forensic pathology and Medicine, over the years there have been quite a few articles concerning these questions.
"Same thing for the Journal of Forensic Sciences. The new E-journal we have, through our National Association of Medical Examiners, academic forensic pathology has some entries. They are in the hundreds, if not the thousands."
(R. 516-17.) The circuit court accepted Dr. Dunton as an expert.
Dr. Dunton testified that he performed an autopsy on J.P. and that J.P. had blunt force trauma injuries to her head and bruising on both sides of her head, that she had a skull fracture, that she had bilateral, multilayered, and diffused retinal hemorrhages, that she had injuries to her ribs, and that it was his opinion that J.P. died of blunt-force trauma to her neck and head. It was his opinion, Dr. Dunton said, that the injuries to J.P.'s ribs were not typical of accidental falls but were something that showed up in child-abuse cases and that the injuries J.P. suffered were not the result of falling off of a bed.
The Kentucky Supreme Court addressed the admissibility of expert testimony under Rule 702, Kentucky Rules of Evidence, a rule virtually identical to Rule 702, Ala. R. Evid. In Futrell v. Commonwealth, 471 S.W.3d 258, 282-83 (Ky. 2015), the Kentucky Supreme Court stated:
"In our courts, the admissibility of expert testimony is governed by Kentucky Rule of Evidence (KRE) 702. That rule provides as follows:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if
"(1) the testimony is based upon sufficient facts or data,
"(2) the testimony is the product of reliable principles and methods, and
"(3) the witness has applied the principles and methods reliably to the facts of the case.
"Our rule is identical to its federal counterpart, Rule 702 of the Federal Rules of Evidence. Both rules incorporate guidance provided by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under Daubert, a trial court's task in assessing proffered expert testimony is to determine whether the testimony 'both rests on a reliable foundation and is relevant to the task at hand.' Daubert, 509 U.S. at 597, 113 S.Ct. 2786. In making its reliability determination, the trial court must consider " 'whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.' " Toyota Motor Corp. v. Gregory, 136 S.W.3d 35, 39 (Ky. 2004) (quoting Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786 ). As the United States Court of Appeals for the Sixth Circuit has noted, ' Daubert attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading "junk science" on the other.' Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 176-77 (6th Cir. 2009). The court's role is not to judge the correctness of the expert's conclusions; that assessment is for the jury. The court's gatekeeping role, rather, *1184 is to 'focus ... solely on [the] principles and methodology' employed to generate the conclusions, and to ensure that those principles and methods are reliable. Daubert, 509 U.S. at 595, 113 S.Ct. 2786.
"There is no 'definitive checklist or test' for determining reliability, but in Daubert the Court recognized a number of factors bearing on the inquiry. These include whether the principle, theory, or method in question 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether it has a 'known or potential rate of error,' and whether it enjoys acceptance within 'a relevant scientific community.' 509 U.S. at 593-94, 113 S.Ct. 2786. Appellants contend that all of these ' Daubert factors' weigh against the admissibility of Dr. [Melissa] Currie's inflicted-injury testimony, and that the trial court therefore abused its discretion by allowing that testimony to be introduced. Appellants, however, have failed to appreciate the basis of Dr. Currie's opinion.
"To begin, Daubert concerned scientific expertise, but the Court subsequently explained that Rule 702 applies to other types of expertise as well and that '[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Citing Kumho Tire, this Court has upheld the admission of a forensic pediatrician's opinion to the effect that burns on a child had been inflicted. The opinion was adequately supported, we held, by case reports documenting burns inflicted by means of cigarette lighters and by the doctor's own experience with patients who had suffered such burns. 'The cause of an injury may be within the ambit of an expert witness's specialized knowledge,' we held, 'and is properly admissible subject to the trial judge's KRE 702 determination.' Ratliff v. Commonwealth, 194 S.W.3d 258, 270 (Ky. 2006). At the Daubert hearing in this case, Dr. Currie testified that her opinion was in part based on her familiarity with a voluminous body of case reports concerning injuries like those suffered by the child in this case and on her experience as a consultant in more than 3000 cases of potential child abuse, in most of which she had herself examined the child."
471 S.W.3d at 282-83.
Whether a witness is qualified to testify as an expert is a question within the sound discretion of the trial court. See Lockhart v. State, 163 So.3d 1088, 1156 (Ala. Crim. App. 2013). As detailed above, the five physicians all testified extensively concerning their qualifications and experience and their basis of knowledge for their opinions. It is clear that the circuit court fully complied with the requirements of newly amended Rule 702, Ala. R. Evid., and properly determined that the experts's testimonies were reliable. The circuit court did not abuse its discretion in allowing the five physicians to state their expert opinions concerning whether J.P.'s extensive injuries were the result of a fall from a bed.
For the foregoing reasons, we affirm Payne's conviction for murder and his sentence of life imprisonment.
AFFIRMED.
Windom, P.J., and Kellum, Burke, and Joiner, JJ., concur.

Some courts have held that: "A differential diagnosis is deemed reliable for Daubert purposes if it is rendered after the physician conducts a physical examination, takes a medical history, reviews clinical tests, including laboratory tests, and excludes obvious (but not all) alternative causes." State v. McMullen, 900 A.2d 103, 116 (D.N.J. 2006). Alabama has not recognized this "clinical exception" to the Daubert requirements.